KRISTIN L. MARTIN (SBN 206528)
DAVIS, COWELL & BOWE, LLP
595 Market Street, Suite 800
San Francisco, CA 94105
Telephone:     (415) 597-7200
Facsimile:     (415) 597-7201
E-mail:        klm@dcbsf.com

*Attorney for Petitioner*
*UNITE HERE International Union*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITE HERE INTERNATIONAL UNION, | Case No. |
| Petitioner, | |
| v. | **PETITION TO COMPEL ARBITRATION** |
| SHINGLE SPRINGS BAND OF MIWOK INDIANS; DOES 1-100, | |
| Respondent. | |

     1.     This is a petition to compel arbitration in accordance with a Memorandum of Agreement between Petitioner UNITE HERE International Union (hereinafter, "Union") and the Shingle Springs Band of Miwok Indians (hereinafter, "Tribe").  The Memorandum of Agreement sets out procedures for union organizing and contains a broad arbitration clause governing all disputes about interpretation or application of the Memorandum of Agreement.  The Tribe has refused to submit to arbitration a dispute over the discharge of two employees, whose discharges the Union contends violates the Memorandum of Agreement.  The question whether the Memorandum of Agreement can be interpreted to prohibit employees discharges is itself a dispute that must be resolved through arbitration.

**PARTIES**

2.      Petitioner UNITE HERE International Union is a labor organization representing employees in industries affecting commerce within the meaning of Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.  The Union represents employees in the Eastern District of California.

3.      Respondent Shingle Springs Band of Miwok Indians owns and operates a casino gaming facility, known as Red Hawk Casino, in El Dorado County, California, which is in the Eastern District of California.  The Tribe is an employer within the meaning of Section 301 of the LMRA, 29 U.S.C. § 185.

4.      The Union is ignorant of the true names and capacities of respondents sued herein as Does 1-100, inclusive, and therefore sues these respondents by such fictitious names.  The Union will amend this complaint to allege their true names and capacities when ascertained.  The Union is informed and believed and thereon alleges that each of these fictitiously named respondents is responsible in some manner for the failure of the Tribe to arbitrate as set forth in this petition.

**JURISDICTION AND VENUE**

5.      This Court has jurisdiction pursuant to Section 301 of the LMRA, 29 U.S.C. §185, and the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*.

6.      Venue lies within this judicial district pursuant to Section 301(a) of the LMRA, 29 U.S.C. §185(a).

**GENERAL ALLEGATIONS**

7.      The Union is informed and believes and thereupon alleges that no more than 500 people are enrolled members of the Tribe.

8.      The Tribe and the United States have not entered into any treaty.  No treaty between the Tribe and the United States exempts the Tribe from jurisdiction of the Labor Management Relations Act.

9.      The Red Hawk Casino is open to the public 24 hours each day and seven days each week.

10.     The Red Hawk Casino's gaming facilities include more than 2,400 slot machines, table

PETITION TO COMPEL ARBITRATION                              CASE NO.

games, a high limit gaming room, and a poker room.  The Red Hawk Casino allows customers to participate in a "member rewards" program called the Red Hawk Rewards Club.  The Red Hawk Rewards Club is operated by Casino Hosts who speak English, Spanish, Chinese, Vietnamese and Tagolog.

11.     The Red Hawk Casino's food and beverage outlets include a high-end steakhouse, an Asian food restaurant, a Mexican grille, a buffet, a casual dining restaurant called "Two Rivers Café", a snack food outlet, and several bars.  The Red Hawk Casino's entertainment facilities include a live music venue, an arcade, and children's programs.  The Red Hawk Casino offers its patrons shuttle service from the Sacramento area, the San Francisco Bay area, and central California locations as far away as Stockton, Lodi, Modesto, and Turlock.

12.     The Union is informed and believes and thereupon alleges that the Red Hawk Casino took in over $50 million in gross revenue in 2014.  The Union is informed and believes and thereupon alleges that the Red Hawk Casino took in over $50 million in gross revenue in 2015.

13.     The Union is informed and believes and thereupon alleges that the vast majority of the people who patronize the Red Hawk Casino are not members of the Tribe or of any other federally recognized Native American tribe.

14.     The Union is informed and believes and thereupon alleges that the vast majority of the people who are employed by the Red Hawk Casino are not members of the Tribe or of any other federally recognized Native American tribe.

15.     The Union and the Tribe are parties to a Memorandum of Agreement (hereinafter, "the Agreement") dated June 26, 2012.  A true and correct copy of the signed Agreement is attached hereto as Exhibit A.  The Agreement refers to a Tribal Labor Relations Ordinance.  A true and correct copy of the Tribal Labor Relations Ordinance is attached hereto as Exhibit B.

16.     Paragraph 10 of the Agreement sets out procedures for resolving disputes under the Agreement.  Paragraph 10 provides, in relevant part:

> The Parties agree that any disputes over the interpretation or application
> of this Agreement shall be submitted first to mediation arranged through
> a mutually agreeable mediator such as, by way of illustration only, the
> American Arbitration Association.  If after a minimum of 30 business
> days after submission of the dispute to a mediator, a mutually satisfactory

1
2
3

> resolution is not produced by mediation, or if after a maximum of 15 business days a mutually agreeable mediator is not chosen after impasse over any dispute, then either the Tribe or the Union may submit the dispute(s) to expedited and binding arbitration before an arbitrator selected from the TLP.  The arbitrator shall not modify, add to or subtract from this Agreement.

4   17.   By Paragraph 14(b) of the Agreement, the Tribe waived its immunity from suit in this

5   case.  By Paragraph 14(b), the Tribe also waived the duty to exhaust tribal remedies.  Paragraph 14(b)

6   states, in relevant part, "The Tribe expressly waives, in a limited manner, its immunity from suit and

7   consents to be sued in any court of competent jurisdiction, including federal and state courts in

8   California, without exhausting tribal remedies, with respect to matters arising out of this

9   Agreement … ."

10   18.   On or about November 18, 2015, the Union notified the Tribe by letter of a dispute

11   about the interpretation or application of the Agreement ("Notification Letter).  The Notification Letter

12   states, in relevant part: "Paragraph 5 of that Agreement requires the Tribe to be neutral with respect to

13   employees' choice whether to be represented by UNITE HERE.  We have learned of repeated

14   violations of this policy by Casino managers.  These violations have taken the form of threats,

15   surveillance and instructions to employees that they may not even talk about the union.  Most

16   egregiously, employee Christopher Garrigues was terminated because he solicited support for the union

17   during his break time."  In the letter, the Union submitted the dispute to arbitration.  A true and correct

18   copy of the Notification Letter is attached hereto as Exhibit C.

19   19.   On or about December 3, 2015, the Union and the Tribe, through their respective

20   attorneys, selected Norman Brand to serve as the mediator.  On or about December 7, 2015, the Union

21   and the Tribe, through their respective attorneys, agreed to hold the mediation on January 7, 2016.

22   20.   On or about December 17, 2015, the Union and the Tribe, through their respective

23   attorneys, agreed that if the dispute were not resolved in mediation, the dispute would be submitted to

24   arbitration before Arbitrator John Kagel.  A true and correct copy of a trail of email messages reflecting

25   this agreement is attached hereto as Exhibit D.

26   21.   On or about December 18, 2015, the Tribe's counsel sent a letter to the Union's counsel

27   in which she asserted that the Union had violated Paragraph 5(c) of the Agreement and intended to raise

28   that dispute at the mediation on January 7, 2016.  A true and correct copy of the Tribe's December 18,

4

2015 letter is attached hereto as Exhibit E.

22.      On or about December 18, 2015, the Union and the Tribe, through their respective attorneys, participated in a conference call with Mediator Brand.  On that conference call, the parties agreed that at the mediation scheduled for January 7, 2016, the parties could raise additional issues beyond those set out in the Union's Notification Letter.  On the December 18 conference call, the parties further agreed to set out the issues that they intended to raise at the mediation on nonconfidential mediation briefs to be submitted on January 5, 2015.

23.      The mediation was held on January 7, 2016, but did not result in a resolution of the dispute.

24.      From at least November 27, 2015 through the mediation that occurred on January 7, 2016, Sandra McCandless of Denton's represented the Tribe in connection with the dispute described in paragraph 18 to 23 of this Petition.  On or about January 21, 2016, the Tribe notified the Union's counsel that the Tribe had retained Treavor Hodson to represent the Tribe in this dispute.

25.      On or about January 27, 2016, the Tribe and the Union, through their respective attorneys, spoke by telephone.  In that telephone call, the parties' counsel discussed the issues in dispute and whether to proceed to arbitration before Norman Brand, who had served as the mediator, or John Kagel, whom the parties had previously agreed would serve as the arbitrator.  The parties' counsel agreed that the Tribe could decide whether Norman Brand or John Kagel would serve as the arbitrator. In that telephone call, the Tribe's counsel did not state that the Tribe would not arbitrate some or all of the issues in dispute.

26.      By email dated January 28, 2016, the Tribe, though its counsel, agreed that John Kagel would serve as the arbitrator.  A true and correct copy of that email is attached hereto as Exhibit F.

27.      The Union seeks to arbitrate the question whether the Tribe violated the Agreement by discharging employees Chris Garrigues and Kerry Bond.  By letter dated February 4, 2016, the Tribe, though its counsel, refused to arbitrate disputes over employee discharges.  A true and correct copy of that letter is attached hereto as Exhibit G.

28.      By letter dated February 8, 2016, the Union, though its counsel, responded to the Tribe's counsel's February 4, 2016 letter.  A true and correct copy of that letter is attached hereto as Exhibit H.

PETITION TO COMPEL ARBITRATION                                    CASE NO.

**CAUSE OF ACTION – Order Compelling Arbitration**

29.     Local 2850 incorporates by reference the allegations contained in Paragraphs 1 to 28 as if fully set forth herein.

30.     The Union and the Tribe dispute whether the Tribe has an obligation to arbitrate disputes over employee discharges violates the Agreement.  Resolution of this dispute is within the exclusive jurisdiction of the Arbitrator.

31.     The Union and the Tribe dispute whether the Tribe's discharge of employee Chris Garrigues violated the Agreement.  Resolution of this dispute is within the exclusive jurisdiction of the Arbitrator.

32.     The Union and the Tribe dispute whether the Tribe's discharge of employee Kerry Bond violated the Agreement.  Resolution of this dispute is within the exclusive jurisdiction of the Arbitrator.

**REQUEST FOR RELIEF**

Wherefore, the Union prays that this Court:

a.  Enter a judgment in the Union's favor and compel the Tribe to submit to arbitration before Arbitrator Kagel all disputes with the Union regarding interpretation or application of the Agreement pursuant to Paragraph 10 of the Agreement, including but not limited disputes over the discharges of Chris Garrigues and Kerry Bond;

b.  Award the Union its costs and reasonable attorneys fees expended in bringing this petition;

c.  Award to the Union any and all other relief as this Court deems just and proper.

Dated:  February 22, 2016

Respectfully submitted,
**DAVIS, COWELL & BOWE, LLP**

By:   */s/ Kristin L. Martin*
       Kristin L. Martin
595 Market Street, Suite 800
San Francisco, California 94105
Tel:  (415) 597-7200; Fax: (415) 597-7201

*Attorneys for UNITE HERE International Union*

**EXHIBIT A**

# MEMORANDUM OF AGREEMENT

**THIS MEMORANDUM OF AGREEMENT** (the "Agreement") is made and entered into on this ___ day of June, 2012 by and between the Shingle Springs Band of Miwok Indians, a federally-recognized Indian tribe,  (the "Tribe"), a federally recognized Indian Tribe listed in the Federal Register as the Shingle Springs Band of Miwok Indians, on behalf of itself and its affiliates, and **UNITE HERE** International Union (the "Union") on behalf of itself and its affiliates, and pertains to the Tribal Gaming Facility and other related facilities providing hospitality or recreational services to the casino guests (the "Casino"), the only significant purpose of which is to facilitate patronage of the Class III gaming operations operated by the Tribe or any legal entity substantially under the control of the Tribe and located on the Tribe's Rancheria in El Dorado County, California.  The Tribe and the Union are collectively referred to herein as the "Parties."

## RECITALS

A.    On October 8, 1999, the Tribe and the State of California (the "State") entered into a Tribal-State Compact to, among other things, allow for Class III gaming on the Tribe's reservation lands located in El Dorado, California (the "1999 Compact").  The 1999 Compact was amended by that certain Amendment to the Tribal–State Compact between the State and the Tribe, dated June 30, 2008 (the "First Amendment").  The Compact and the First Amendment are collectively referred to herein as the "Compact".

B.    In accordance with the Tribe's Compact obligations to the State, on September 14, 1999, the Tribe adopted the Tribal Labor Relations Ordinance, as amended from time to time (the "TLRO") and on October 6, 1999, the Tribe notified the State of the adoption of the TLRO.

C.    The Tribe is currently seeking to enter into a Second Amendment to the Compact that would significantly reduce the amount of general fund revenue sharing payments to the State to ensure that the Tribe is the primary beneficiary of the Casino as required under federal law (the "Second Amendment Process").  As a result of the Second Amendment Process, the Tribe and State anticipate that a Second Amendment to the Compact will be executed and approved by the Tribe and the Governor's Office, ratified by the California Legislature, and approved by the United States Secretary of Interior.

D.    As part of Second Amendment Process, the Tribe and the Union enter into this Agreement for the following purposes (i) to ensure an orderly environment for the exercise by Bargaining Unit Employees (as defined herein) of their rights under the TLRO (ii) to avoid strikes, picketing and/or other adverse economic or public relations activity directed at the Tribe in the event the Union decides to conduct an organizing campaign among Eligible Employees; and (iii) implementation of a Card Check Recognition Process pursuant to the terms of this Agreement.

**NOW, THEREFORE, THE PARTIES HAVE REACHED THE FOLLOWING UNDERSTANDINGS:**

1

2901682.10

1.     **Definitions**

   a.   **"Approved Second Amendment to Compact"** means a Second Amendment to the Compact (as defined herein) which shall be considered effective and approved on the date that all of the following have occurred: (i) approval and execution of the Second Amendment to Compact by the Governor and Tribe; (ii) ratification and enactment by the California Legislature of the Second Amendment to Compact; and (iii) approval by the United States Secretary of Interior.

   b.   **"Bargaining Unit Employees"** means Eligible Employees as defined in the TLRO and for purposes of this Agreement, Eligible Employees and Bargaining Unit Employees shall exclude marketing personnel or those employees that primarily provide marketing services for the Casino.

   c.   **"Casino"** means the commercial gaming business operated by the Tribe or its Manager on its Indian lands and related facilities providing hospitality or recreational services to the casino guests, as defined in the TLRO, the only significant purpose of which is to facilitate patronage to the Class III gaming operations, authorized by the Indian Gaming Regulatory Act (IGRA) and the Compact, together with any other lawful commercial activity related to such gaming allowed in the facility including, but not limited to, the sale of food, beverages, tobacco, gifts, and souvenirs. This definition is intended to include a hotel adjacent to the Tribe's Gaming Facility.

   d.   **"Commencement Date"** means the date by which the California Legislature has ratified and the Department of Interior has approved the Approved Second Amendment to the Compact.

   e.   **"Compact"** means the Tribal-State Compact entered into on October 8, 1999 between the Tribe and the State as amended by that certain Amendment to the Tribal–State Compact between the State and the Tribe, dated June 30, 2008, and as may be further amended from time to time.

   f.   **"Eligible Employee"** shall have the same definition set forth in the TLRO and for purposes of this Agreement, Eligible Employees shall exclude marketing personnel or those employees that primarily provide marketing services for the Casino.

   g.   **"Gaming Facility"** means the physical area or areas collectively within a building, or within a group of buildings at the same location in which Class III Gaming is conducted.

   h.   **"Manager"** means any entity other than the Tribe which is retained to operate the Casino (as defined herein).

   i.   **"Second Amendment to Compact"** or **"Second Amendment"** means the Second Amendment to the Compact between the Tribe and the State.

2

j. **"TLP"** means Tribal Labor Panel constituted by the State under the Department of Personnel Administration pursuant to the TLRO, or if the Department of Personnel Administration does not constitute or maintain such a panel, a panel of nine labor arbitrators residing in California obtained from the American Arbitration Association.

k. **"TLRO"** means the Tribal Labor Relations Ordinance adopted by the Tribe, as may be amended from time to time, pursuant to the Compact and this Agreement which will be attached hereto as Attachment 1, and made part of this Agreement.

l. **"Tribe"** means the means the Shingle Springs Band of Miwok Indians, a federally recognized Indian tribe listed in the Federal Register as the Shingle Springs Band of Miwok Indians, and does not include enterprises other than the Casino as defined above.

m. **"Union"** means UNITE HERE International Union.

2. **Term; Access**

a. This Agreement is for a term beginning upon the Commencement Date and ending on the date that is five (5) years thereafter or sooner upon the execution of a Collective Bargaining Agreement or issuance of an arbitration award, which concludes the Collective Bargaining Agreement negotiations, either of which explicitly supersedes this Agreement.

b. During the term of this Agreement, as described in paragraph 2(a) hereof, if the Union provides written notice to the Tribe of its intent to organize Bargaining Unit Employees covered by this Agreement, the Tribe shall provide access by the Union to its Gaming Facility and to such Bargaining Unit Employees in accordance with the TLRO.

3. **Applicability**

All card check procedures and any recognition of the Union provided for by this Agreement shall be applicable only to "Bargaining Unit Employees" of the Casino as defined herein.

4. **Card Cheek Recognition Procedure**

This Agreement shall cover all employees defined as "Bargaining Unit Employees" in this Agreement.

a. Within ten (10) working days following receipt of written notice of intent to organize Bargaining Unit Employees, which shall not be submitted by Union prior to Commencement Date, the Tribe shall provide, upon written request, to the Union the names, last known addresses and telephone numbers and work classifications or titles of all Bargaining Unit Employees, and every thirty (30) days thereafter upon

3

2901682.10

additional written requests from the Union, the Tribe will send an updated list of Bargaining Unit Employees to the Union with the names, addresses, telephone numbers and work classifications or titles of all Bargaining Unit Employees.

b.  The Tribe agrees that the Union shall be recognized as the exclusive bargaining agent for Bargaining Unit Employees not later than ten (10) days after receipt by the Tribe of written notice from the TLP that the Union has presented and the TLP has independently verified valid authorization cards signed by a majority (50%+1) of Bargaining Unit Employee authorizations as provided for in this Agreement, provided that another union is not the certified representative of the bargaining unit.

c.  For the purposes of determining the number of employees that constitute a majority of the bargaining unit, the Bargaining Unit Employee population will be composed of only those Bargaining Unit Employees employed in the bargaining unit on the date that the Union requests in writing to the TLP for a determination that valid authorization cards have been signed by a majority (50%+1) of Bargaining Unit Employees.   The Tribe shall provide the TLP the names and job titles of all Bargaining Unit Employees and other information required for the TLP to verify the existence of a majority (50%+1) of Eligible Employee authorizations as provided for in this Agreement.

## 5.   Neutrality

a.  The Tribe shall advise Bargaining Unit Employees that it is neutral to their selection of the Union as their exclusive representative, if any, and shall not directly or indirectly state or imply opposition to the selection by Bargaining Unit Employees of the Union as their exclusive representative, if any, and shall so instruct all appropriate Managers.

b.  For the purposes of this Agreement "Neutrality" means that Manager or management shall not express any opinion for or against Union representation of any existing or proposed bargaining unit composed of Bargaining Unit Employees, or for or against the Union or any officer, member or representative thereof in their capacity as such. Furthermore, Manager or management shall not make any statements or representations as to the potential effects or results of Union representation on the Tribe or any Bargaining Unit Employee or group of Bargaining Unit Employees. The Union also agrees that, neither the Union nor any of its officers, representatives, agents or employees will express publicly any negative comments concerning the motives, integrity or character of the Tribe, the Tribe's management contractor, in its capacity as the Tribe's management contractor, or any of their officers, agents, directors or employees.

c.  The Union and its representatives will not directly or indirectly coerce or threaten any employee in an effort to obtain authorization cards.

## 6.   Valid Authorization Cards

4

For the purposes of this Agreement, a valid written authorization card shall state specifically that by signing the card, the Bargaining Unit Employee, agrees to be represented by the Union. The Union shall furnish the Tribe with a Union Authorization Card and it shall be set forth as Attachment 2 of this Agreement, and made part of this Agreement.

**7.    Authorization to Negotiate Collective Bargaining Agreement Upon Recognition**

(a)    If the Union is recognized as the exclusive collective bargaining representative as provided in Section 4(c) of this Agreement, the Union shall be entitled to represent Bargaining Unit Employees in the defined unit in any matters arising under the TLRO according to the following schedule: (i) for the first 60 days following the effective date of recognition, the Tribe and the Union shall engage in an informal exchange of information and documents about terms and conditions of employment and in non-binding problem solving meetings about workplace concerns; and (ii) following completion of the period in (i) but no sooner than 120 days after the Commencement Date, negotiate in good faith for a Collective Bargaining Agreement covering Eligible Employees on wages, hours and other terms and conditions of employment. However, recognizing that operational changes may occur, the Union agrees that in the event the Tribe meets with the Union after recognition but prior to the completion of contract negotiations and proposes an operational change that may have an impact on Eligible Employees, the Union agrees that it will not unreasonably withhold agreement that those changes can be made without bargaining with the Union. This paragraph 7(a) does not include wages, benefits or other economic conditions with respect to Eligible Employees. If the Parties are unable to reach agreement within one hundred and twenty (120) days following commencement of negotiations for a Collective Bargaining Agreement, all unresolved issues shall be submitted for resolution to the Tribal forum designated by the Tribe pursuant to the TLRO.

(b)    If the Tribal forum does not resolve all the issues to the mutual satisfaction of the Tribe and the Union within sixty (60) business days of submission, the Tribe and Union may, prior to proceeding to arbitration, agree to mediation through a mutually agreeable mediator, with costs of the mediator to be shared equally by the Parties.

(c)    If the Parties do not agree to proceed with mediation as provided for in Section 7(b) above or if the Parties elect to proceed with mediation and after thirty (30) business days after submission of the dispute to mediation, a mutually satisfactory resolution is not produced by mediation, then the Tribe or the Union may immediately submit the remaining issues to arbitration before an arbitrator selected from the TLP. The arbitrator shall consider, but not be limited to, the following factors:

(i)    Wages, hours and other terms and conditions of employment of the Tribe's competitors, a list of which shall be mutually agreed upon by the Union and the Tribe or which shall be established by the arbitrator;

(ii)    Size and type of the Tribe's operations at the Casino and related facilities as defined herein;

(iii)    The Tribe's financial capacity (if the Tribe places this in issue);

5

| | |
|---|---|
| (iv) | Cost of living as it affects the Eligible Employees; |
| (v) | Ability of Employees, through a combination of wages, hours and benefits, to earn a living wage to sustain themselves and their families; |
| (vi) | Regional and local market conditions; |
| (vii) | Cost increases and revenues at the Casino, if raised by the Tribe; |
| (viii) | Factors uniquely applicable to the security needs of a gaming facility; |
| (ix) | Stipulations of the parties; |
| (x) | Employees' productivity; and |
| (xi) | Such other factors, not confined to the foregoing, which are normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment through voluntary collective bargaining mediation, fact-finding, arbitration or otherwise between the parties. |

The arbitrator shall select the individual final proposal of one of the Parties for each of the individual remaining unresolved issue(s), and shall issue a final and binding award incorporating the complete proposal(s) of the Tribe or the Union without modification.

## 8.    Subcontracting

It is recognized that the Tribe and the Union have a common interest in protection work opportunities for all Employees covered by this Agreement and employed on a regular basis. Therefore, no work customarily performed by Employees covered by this Agreement shall be performed under any sublease, subcontract, or other agreement unless the terms of any lease, contract or other agreement specifically state that (a) all such work shall be performed only by members of the bargaining unit covered by this Agreement, and (b) the Tribe shall at all times hold and exercise full control of the terms and conditions of employment of all such Employees pursuant to the terms of this Agreement. The provisions of this Article apply to all operations on the Tribe's premises covered by this Agreement, regardless of location or displacement of employees or prior use of the area occupied by such operations. Notwithstanding the foregoing provisions hereof, the Tribe may purchase from outside sources for use in its establishment convenience foods, prepared frozen foods, pre-mixed salads and peeled vegetables because this is work not customarily performed by bargaining unit employees.

## 9.    Regulatory and Legislative Support

The Union hereby agrees to actively support before the appropriate federal, state, and local administrative, bureaucratic, regulatory and legislative bodies the Tribe's efforts during the Second Amendment Process and to take all reasonable and necessary steps to assist the Tribe in obtaining an Approved Second Amendment to Compact and authorization to develop a hotel adjacent to its Gaming Facility.  With regard to the Tribe's long term goals of economic development within and beyond the hospitality industry, job creation and growth on the Tribe's reservation and within the State of California, the Tribe and the Union may reach future agreements concerning political support and organization, but no agreement has been reached at present and any future agreement would be reflected in a separate written document.  For purposes of this Agreement "active support" includes letter writing, consultation with and

lobbying of elected and appointed officials, availability of members for events in furtherance of the Tribe's goals, opposition to competitor's efforts to prohibit the Tribe's entry into tribal government gaming on its lands in El Dorado County, California, and assistance with local government relations.

**10.    Dispute Resolution**

The Parties agree that any disputes over the interpretation or application of this Agreement shall be submitted first to mediation arranged through a mutually agreeable mediator such as, by way of illustration only, the American Arbitration Association. If after a minimum of 30 business days after submission of the dispute to a mediator, a mutually satisfactory resolution is not produced by mediation, or if after a maximum of 15 business days a mutually agreeable mediator is not chosen after impasse over any dispute, then either the Tribe or the Union may submit the dispute(s) to expedited and binding arbitration before an arbitrator selected from the TLP. The arbitrator shall not modify, add to or subtract from this Agreement. The arbitrator shall follow the arbitration procedures prescribed in the TLRO. The arbitrator shall have the authority to order the non-compliant party to comply with this Agreement. The Parties hereto agree to comply with any order of the arbitrator, which shall be final and binding, and shall be enforceable as provided in the TLRO. This Section 9 (Dispute Resolution) shall not be used to resolve any issues that are unresolved during the negotiation of a collective bargaining agreement. The Parties shall rely exclusively upon the method specified in Section 7 of this Agreement to resolve any unresolved issues during collective bargaining negotiations.

**11.    Picketing and Other Economic Activity**

During the term of this Agreement, the Union will not engage in any strike, picketing or other adverse economic or public relations activity at the Casino, and the Tribe will not engage in a lockout of the Eligible Employees. Notwithstanding the foregoing, if the Tribe recognizes any union besides the Union as the exclusive collective bargaining representative of Eligible Employees, or any of them, this paragraph shall terminate immediately and without notice.

**12.    Severability**

Should any portion of this Agreement be voided or held unlawful or unenforceable by a court of competent jurisdiction, the remaining provisions shall remain in full force and effect for the duration of this Agreement.

**13.    Compliance with TLRO**

Nothing herein shall be construed to be inconsistent with or derogate from the obligation of the Union and the Tribe to conform to the TLRO.

**14.    Miscellaneous**

7

2901682.10

a. **Amendment or Modification.**  This Agreement may be modified or amended only by a written instrument executed by the Tribe and the Union, pursuant to the same authorizations used to execute this Agreement in its original form.

b. **Limited Waiver of Sovereign Immunity**.  By this Agreement, the Tribe does not waive, limit, or modify its sovereign immunity from suit except as provided in this Section.  The Tribe expressly waives, in a limited manner, its immunity from suit and consents to be sued in any court of competent jurisdiction, including federal and state courts in California, without exhausting tribal remedies, with respect to matters arising out of this Agreement and in the event that the Union is recognized and the Tribe and the Union negotiate a collective bargaining agreement, then this limited waiver will also apply to that agreement, unless the parties mutually agree to a different form of waiver.  Said waiver is specifically limited to the following actions and remedies:

> A. <u>MONETARY DAMAGES.</u> The enforcement of an award of money damages by arbitration pursuant to this Agreement, provided that, such award shall be limited to actual damages and shall specifically exclude punitive, consequential, incidental, expectancy and all other special damages and further provided that the arbitrator(s) and/or court shall have no authority or jurisdiction to order execution against any assets of the Tribe except for the assets of the Casino (not including the real property or the physical building structure or fixtures) and future undistributed net revenue of the Casino.

> B. <u>INJUNCTIVE RELIEF AND SPECIFIC PERFORMANCE.</u> The enforcement of a determination by arbitration pursuant to this Agreement that mandates the Tribe to specifically perform any obligation under this Agreement.

> C. <u>ACTION TO COMPEL ARBITRATION.</u> An action to compel arbitration pursuant to this Agreement.

The sovereign immunity waiver by the Tribe as set forth in this Agreement only extends to claims or proceedings brought by the Union as specified above and shall not be enforced by any other party other than the Parties to this Agreement and shall not give rise to any claim or liability to any other third party other than the Parties hereto.

c. **Entire Agreement.**  This Agreement is the entire agreement between the Parties and supersedes all prior written and oral agreements, if any, with respect to the subject matter hereof.

d. **Governing Law**.  This Agreement shall be governed by and construed pursuant to the Compact and the TLRO and all of their attendant articles and references to legal jurisdictions.

e. **Mutual Good Faith.**  Throughout the term of this Agreement, the Parties agree to exercise good faith and to observe the covenants herein.

2901682.10

f.   **Standard of Reasonableness.**  Unless specifically provided otherwise, all provisions of this Agreement and all collateral agreements shall be governed by a standard of reasonableness.

g.   **Plain Meaning**.  Where terms, phrases or words are not defined, they shall have their ordinary accepted meanings within the context with which they are used.  The edition current on January 1, 2003 of Webster's Third New International Dictionary of the English Language, Unabridged shall be considered as providing ordinarily accepted meanings.

h.   **Captions**.  The captions of each paragraph, section, or subsection contained in the Agreement are for ease of reference only and shall not affect the interpretation or meaning of this Agreement.

i.   **Authorization**.  The Tribal Chairperson, Nicholas Fonseca, has been authorized by an appropriate resolution of the Tribe to execute this Agreement.  The Union warrants that the California Political Director, Jack Gribbon, has been authorized to execute this Agreement on behalf of the Union.

j.   **Notices.**  Notices pursuant to this Agreement shall be sent:

> If to the Tribe:

> Nicholas Fonseca, Tribal Chairman
> Shingle Springs Band of Miwok Indians
> P.O. Box 1340
> Shingle Springs, CA  95682
> Telephone: 530-676-8010

> With a copy to (which shall not constitute notice to a party):

> General Counsel
> Shingle Springs Band of Miwok Indians
> P.O. Box 1340
> Shingle Springs, CA 95682
> Telephone: 530-676-8010

> If to the Union:

> [Insert]

9

2901682.10

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement on the day and year first above written.

SHINGLE SPRINGS BAND OF MIWOK          UNITE HERE International Union
INDIANS

By: _____          By _____
    Nicholas Fonseca, Tribal Chairman              Jack Gribbon
                                  Its:  California Political Director

10

2901682.10

**EXHIBIT B**



# SHINGLE SPRINGS RANCHERIA

Shingle Springs Band of Miwok Indians,
Shingle Springs Rancheria
(Verona Tract), California
5281 Honpie Road, Placerville, CA 95667
P.O. Box 1340; Shingle Springs, CA 95682
(530) 676-8010 office;(530)676-8033 Fax

### TRIBAL LABOR RELATIONS ORDINANCE

**SUBJECT:  RULES & PROCEDURAL REQUIREMENTS GOVERNING THE TRIBAL LABOR RELATIONS ACTIVITIES OF THE SHINGLE SPRINGS BAND OF MIWOK INDIANS.**

## SECTION 1.  THRESHOLD OF APPLICABILITY

(a) Any Tribe with 250 or more persons employed in a tribal casino and related facility shall adopt this Tribal Labor Relations Ordinance ("TLRO or Ordinance").  For purposes of this ordinance, a "tribal casino" is one in which class III gaming is conducted pursuant to a tribal-state compact.  A "related facility" is one for which the only significant purpose is to facilitate patronage of the class III gaming operations.

(b) Any Tribe which does not operate such a tribal casino as of September 10, 1999, but which subsequently opens a tribal casino, may delay adoption of this ordinance until one year from the date the number of employees in the tribal casino or related facility as defined in 1(a) above exceeds 250.

(c) Upon the request of a labor union, the Tribal Gaming Commission shall certify the number of employees in a tribal casino or other related facility as defined in 1(a) above. Either party may dispute the certification of the Tribal Gaming Commission to the Tribal Labor Panel.

## SECTION 2.  DEFINITION OF ELIGIBLE EMPLOYEES

(a) The provisions of this ordinance shall apply to any person (hereinafter "Eligible Employee") who is employed within a tribal casino in which Class III gaming is conducted pursuant to a tribal-state compact or other related facility, the only significant purpose of which is to facilitate patronage of the Class III gaming operations, except for any of the following:

> (1)  any employee who is a supervisor, defined as any individual having authority, in the interest of the Tribe and/or employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment;

1

(2) any employee of the Tribal Gaming Commission;

(3) any employee of the security or surveillance department, other than those who are responsible for the technical repair and maintenance of equipment;

(4) any cash operations employee who is a "cage" employee or money counter; or

(5) any dealer.

## SECTION 3.  NON-INTERFERENCE WITH REGULATORY OR SECURITY ACTIVITIES

Operation of this Ordinance shall not interfere in any way with the duty of the Tribal Gaming Commission to regulate the gaming operation in accordance with the Tribe's National Indian Gaming Commission-approved gaming ordinance.  Furthermore, the exercise of rights hereunder shall in no way interfere with the tribal casino's surveillance/security systems, or any other internal controls system designed to protect the integrity of the Tribe's gaming operations.  The Tribal Gaming Commission is specifically excluded from the definition of Tribe and its agents.

## SECTION 4.  ELIGIBLE EMPLOYEES FREE TO ENGAGE IN OR REFRAIN FROM CONCERTED ACTIVITY

Eligible Employees shall have the right to self-organization, to form, to join, or assist employee organizations, to bargain collectively through representatives of their own choosing, to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities.

## SECTION 5.  UNFAIR LABOR PRACTICES FOR THE TRIBE

It shall be an unfair labor practice for the Tribe and/or employer or their agents:

(1) to interfere with, restrain or coerce Eligible Employees in the exercise of the rights guaranteed herein;

(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it, but this does not restrict the Tribe and/or employer and certified union from agreeing to union security or dues checkoff;

(3) to discharge or otherwise discriminate against an Eligible Employee because s/he has filed charges or given testimony under this Ordinance;

(4) to refuse to bargain collectively with the representatives of Eligible Employees.

## SECTION 6.  UNFAIR LABOR PRACTICES FOR THE UNION

It shall be an unfair labor practice for a labor organization or its agents:

(1) to interfere, restrain or coerce Eligible Employees in the exercise of the rights guaranteed herein;

(2) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or primary or secondary boycott or a refusal in the course of his employment to use, manufacture, process, transport or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce or other terms and conditions of employment.  This section does not apply to Section 11;

(3) to force or require the Tribe and/or employer to recognize or bargain with a particular labor organization as the representative of Eligible Employees if another labor organization has been certified as the representative of such Eligible Employees under the provisions of this TLRO;

(4) to refuse to bargain collectively with the Tribe and/or employer, provided it is the representative of Eligible Employees subject to the provisions herein;

(5) to attempt to influence the outcome of a tribal governmental election, provided, however, that this section does not apply to tribal members.

## SECTION 7.  TRIBE AND UNION RIGHT TO FREE SPEECH

The Tribe's and union's expression of any view, argument or opinion or the dissemination thereof, whether in written, printed, graphic or visual form, shall not constitute or be evidence of interference with, restraint or coercion if such expression contains no threat of reprisal or force or promise of benefit.

## SECTION 8.  ACCESS TO ELIGIBLE EMPLOYEES

(a) Access shall be granted to the union for the purposes of organizing Eligible Employees, provided that such organizing activity shall not interfere with patronage of the casino or related facility or with the normal work routine of the Eligible Employees and shall be done on non-work time in non-work areas that are designated as employee break rooms or locker rooms that are not open to the public.  The Tribe may require the union and or union organizers to be subject to the same licensing rules applied to individuals or entities with similar levels of access to the casino or related facility, provided that such licensing shall not be unreasonable, discriminatory, or designed to impede access.

(b) The Tribe, in its discretion, may also designate additional voluntary access to the Union in such areas as employee parking lots and non-Casino facilities located on tribal lands.

(c) In determining whether organizing activities potentially interfere with normal tribal work routines, the union's activities shall not be permitted if the Tribal Labor Panel determines that they compromise the operation of the casino:

(1) security and surveillance systems throughout the casino, and reservation;

(2) access limitations designed to ensure security;

3

(3) internal controls designed to ensure security;

(4) other systems designed to protect the integrity of the Tribe's gaming operations, tribal property and/or safety of casino personnel, patrons, employees or tribal members, residents, guests or invitees.

(d) The Tribe shall provide to the union, upon a thirty percent (30%) showing of interest to the Tribal Labor Panel, an election eligibility list containing the full first and last name of the Eligible Employees within the sought after bargaining unit and the Eligible Employees' last known address within ten (10) working days. Nothing herein shall preclude a Tribe from voluntarily providing an election eligibility list at an earlier point of a union organizing campaign.

(e) The Tribe agrees to facilitate the dissemination of information from the union to Eligible Employees at the tribal casino by allowing posters, leaflets and other written materials to be posted in non-public employee break areas where the Tribe already posts announcements pertaining to Eligible Employees. Actual posting of such posters, notices, and other materials, shall be by employees desiring to post such materials.

## SECTION 9.  INDIAN PREFERENCE EXPLICITLY PERMITTED

Nothing herein shall preclude the Tribe from giving Indian preference in employment, promotion, seniority, lay-offs, or retention to members of any federally recognized Indian Tribe or shall in any way affect the Tribe's right to follow tribal law, ordinances, personnel policies or the Tribe's customs or traditions regarding Indian preference in employment, promotion, seniority, lay-offs or retention. Moreover, in the event of a conflict between tribal law, tribal ordinance or the Tribe's customs and traditions regarding Indian preference and this Ordinance, the tribal law, tribal ordinance or the Tribe's customs and traditions shall govern.

## SECTION 10.  SECRET BALLOT ELECTIONS REQUIRED

(a) Dated and signed authorized cards from thirty percent (30%) or more of the Eligible Employees within the bargaining unit verified by the elections officer will result in a secret ballot election to be held within 30 days from presentation to the elections officer.

(b) The election shall be conducted by the election officer. The election officer shall be a member of the Tribal Labor Panel chosen pursuant to the dispute resolution provisions herein. All questions concerning representation of the Tribe and/or Employer's Eligible Employees by a labor organization shall be resolved by the election officer. The election officer shall be chosen upon notification by the labor organization to the Tribe of its intention to present authorization cards, and the same election officer shall preside thereafter for all proceedings under the request for recognition; provided however that if the election officer resigns, dies or is incapacitated for any other reason from performing the functions of this office, a substitute election officer shall be selected in accordance with the dispute resolution provisions herein.

(c) The election officer shall certify the labor organization as the exclusive collective bargaining representative of a unit of employees if the labor organization has received the majority of votes by employees voting in a secret ballot election that the election officer determines to have been conducted fairly. If the election officer determines that the election

4

was conducted unfairly due to misconduct by the Tribe and/or employer or union, the election officer may order a re-run election. If the election officer determines that there was the commission of serious Unfair Labor Practices by the Tribe that interfere with the election process and preclude the holding of a fair election, and the labor organization is able to demonstrate that is had the support of a majority of the employees in the unit at any point before or during the course of the Tribe's misconduct, the election officer shall certify the labor organization.

(d) The Tribe or the union may appeal any decision rendered after the date of the election by the election officer to a three (3) member panel of the Tribal Labor Panel mutually chosen by both parties.

(e) A union which loses an election and has exhausted all dispute remedies related to the election may not invoke any provisions of this labor ordinance at that particular casino or related facility until one year after the election was lost.

## SECTION 11.  COLLECTIVE BARGAINING IMPASSE

Upon recognition, the Tribe and the union will negotiate in good faith for a collective bargaining agreement covering bargaining unit employees represented by the union. If collective bargaining negotiations result in impasse, and the matter has not been resolved by the tribal forum procedures set forth in Section 13(b) governing resolution of impasse within sixty (60) working days or such other time as mutually agreed to by the parties, the union shall have the right to strike. Strike-related picketing shall not be conducted on Indian lands as defined in 25 U.S.C. Sec. 2703 (4).

## SECTION 12.  DECERTIFICATION OF BARGAINING AGENT

(a) The filing of a petition signed by thirty percent (30%) or more of the Eligible Employees in a bargaining unit seeking the decertification of a certified union, will result in a secret ballot election to be held 30 days from the presentation of the petition.

(b) The election shall be conducted by an election officer. The election officer shall be a member of the Tribal Labor Panel chosen pursuant to the dispute resolution provisions herein. All questions concerning the decertification of the labor organization shall be resolved by an election officer. The election officer shall be chosen upon notification to the Tribe and the union of the intent of the employees to present a decertification petition, and the same election officer shall preside thereafter for all proceedings under the request for decertification; provided however that if the election officer resigns, dies or is incapacitated for any other reason from performing the functions of this office, a substitute election officer shall be selected in accordance with the dispute resolution provisions herein.

(c) The election officer shall order the labor organization decertified as the exclusive collective bargaining representative if a majority of the employees voting in a secret ballot election that the election officer determines to have been conducted fairly vote to decertify the labor organization. If the election officer determines that the election was conducted unfairly due to misconduct by the Tribe and/or employer or the union the election officer may order a re-run election or dismiss the decertification petition.

(d) A decertification proceeding may not begin until one (1) year after the certification of a labor union if there is no collective bargaining agreement. Where there is a collective

5

bargaining agreement, a decertification petition may only be filed no more than 90 days, and no less than 60 days prior to the expiration of a collective bargaining agreement. A decertification petition may be filed any time after the expiration of a collective bargaining agreement.

(e) The Tribe or the union may appeal any decision rendered after the date of the election by the election officer to a three (3) member panel of the Tribal Labor Panel mutually chosen by both parties.

## SECTION 13.  BINDING DISPUTE RESOLUTION MECHANISM

(a) All issues shall be resolved exclusively through the binding dispute resolution mechanisms herein, with the exception of a collective bargaining negotiation impasse, which shall only go through the first level of binding dispute resolution.

(b) The first level of binding dispute resolution for all matters related to organizing, election procedures, alleged unfair labor practices, and discharge of Eligible Employees shall be an appeal to a designated tribal forum such as a Tribal Council, Business Committee, or Grievance Board. The parties agree to pursue in good faith the expeditious resolution of these matters within strict time limits. The time limits may not be extended without the agreement of both parties. In the absence of a mutually satisfactory resolution, either party may proceed to the independent binding dispute resolution set forth below. The agreed upon time limits are set forth as follows:

> (1) All matters related to organizing, election procedures and alleged unfair labor practices prior to the union becoming certified as the collective bargaining representative of bargaining unit employees, shall be resolved by the designated tribal forum within thirty (30) working days.

> (2) All matters after the union has become certified as the collective bargaining representative and relate specifically to impasse during negotiations, shall be resolved by the designated tribal forum within sixty (60) working days;

(c) The second level of binding dispute resolution shall be a resolution by the Tribal Labor Panel, consisting of ten (10) arbitrators appointed by mutual selection of the parties which panel shall serve all Tribes that have adopted this ordinance. The Tribal Labor Panel shall have authority to hire staff and take other actions necessary to conduct elections, determine unites, determine scope of negotiations, hold hearings, subpoena witnesses, take testimony, and conduct all other activities needed to fulfill its obligations under this Tribal Labor Relations Ordinance.

> (1) Each member of the Tribal Labor Panel shall have relevant experience in federal labor law and/or federal Indian law with preference given to those with experience in both. Names of individuals may be provided by such sources as, but not limited to, Indian Dispute Services, Federal Mediation and Conciliation Service, and the American Academy of Arbitrators.

> (2) Unless either party objects, one arbitrator from the Tribal Labor Panel will render a binding decision on the dispute under the Ordinance. If either party objects, the dispute will be decided by a three-member panel of the Tribal Labor Panel, which will render a binding decision. In the event there is one arbitrator, five (5) Tribal

6

Labor Panel names shall be submitted to the parties and each party may strike no more than two (2) names.  In the event there is a three (3) member panel, seven (7) TLP names shall be submitted to the parties and each party may strike no more than two (2) names.  A coin toss shall determine which party may strike the first name.  The arbitrator will generally follow the American Arbitration Association's procedural rules relating to labor dispute resolution.  The arbitrator or panel must render a written, binding decision that complies in all respects with the provisions of this Ordinance.

(d)  Under the third level of binding dispute resolution, either party may seek a motion to compel arbitration or a motion to confirm an arbitration award in Tribal Court, which may be appealed to federal court.  If the Tribal Court does not render its decision within 90 days, or in the event there is no Tribal Court, the matter may proceed directly to federal court.  In the event the federal court declines jurisdiction, the Tribe agrees to a limited waiver of its sovereign immunity for the sole purpose of compelling arbitration or confirming arbitration award issued pursuant to the Ordinance in the appropriate state superior court.  The parties are free to put at issue whether or not the arbitration award exceeds the authority of the Tribal Labor Panel.

**CERTIFICATION**

As a duly elected official of the Shingle Springs Rancheria, I do hereby certify that, at a meeting duly
called, noticed and convened on the ___6__ day of _Oct 1999_ adopted by a vote of
__7_ FOR, __0__ OPPOSED, ___0___ ABSTAINED, and said resolution has not been rescinded or
amended in any form.

_Don Adams_
Chairperson

_10/6/99_
Date

ATTEST:

_Nita Johnson_
Secretary

_10-06-99_
Date



# SHINGLE SPRINGS RANCHERIA

P.O. Box 1340
Shingle Springs, CA 95682
Ph. (530) 676-8010  Fax: (530) 676-8033

## RESOLUTION 99-52

## RESOLUTION OF THE TRIBAL COUNCIL OF THE SHINGLE SPRINGS BAND OF MIWOK INDIANS ADOPTING MANDATORY CLASS III GAMING TRIBAL LABOR RELATIONS ORDINANCE SUBJECT TO CONDITIONS SUBSEQUENT

**WHEREAS:** The Tribal Council is the governing body of the Tribe authorized to enter into and implement the Tribal State Gaming Compact between the Tribe and the State of California; and

**WHEREAS:** The Tribal Council has determined that it is necessary to adopt the Tribal Labor Relations Ordinance which was required by the State of California as a precondition To obtaining a Class III Gaming Compact,

**THEREFORE IT IS RESOLVED THAT:**
Upon the effective date of the Compact between the State and the Tribe, the attached Tribal Labor Relations Ordinance shall be deemed adopted when required by Section 1 of said Ordinance.

## CERTIFICATION

As a duly elected official of the Shingle Springs Rancheria, I do hereby certify that, at a meeting duly called, noticed and convened on the _6_ day of _Oct 1999_ adopted by a vote of _7_ FOR, _0_ OPPOSED, _0_ ABSTAINED, and said resolution has not been rescinded or amended in any form.

_Jim Adams_
Chairperson

_10/6/99_
Date

ATTEST:

_Helen Fonseca_
Secretary

_10-06-99_
Date

**EXHIBIT C**

SCANNED

NOV 1 8 2015

# UNITEHERE!

WESTERN REGIONAL OFFICE
243 Golden Gate Avenue, San Francisco CA 94102 • TEL (415) 553-3282 • FAX (415) 621-6820
WWW.UNITEHERE.ORG • facebook.com/UNITEHERE • @UNITEHERE

Nicholas Fonseca, Tribal Chairman
Shingle Springs Band of Miwok Indians
P.O. Box 1340
Shingle Springs, CA 95682

Amy Ann Taylor, General Counsel
Shingle Springs Band of Miwok Indians
P.O. Box 1340
Shingle Springs, CA 95682

Re:   Violation of Memorandum of Agreement between Shingle Springs Band
of Miwok Indians and UNITE HERE International Union

Dear Chairman Fonseca:

As you know, we have entered into a Memorandum of Agreement governing union organizing at Red Hawk Casino. Paragraph 5 of that Agreement requires the Tribe to be neutral with respect to employees' choice whether to be represented by UNITE HERE. We have learned of repeated violations of this policy by Casino managers. These violations have taken the form of threats, surveillance and instructions to employees that they may not even talk about the union. Most egregiously, employee Christopher Garrigues was terminated because he solicited support for the union during his break time.

The Agreement contains a dispute resolution procedure at paragraph 10, the first step of which is mediation before a mutually agreeable mediator. By this letter, we submit this dispute to mediation. We are hopeful that we will be able to reach a prompt resolution but if we cannot we will proceed to arbitration under the TLRO in thirty business days. We suggest Barry Winograd as the arbitrator. If you have other suggestions, we will consider them.

Please contact Kristin Martin, attorney for UNITE HERE to discuss the mediator selection and schedule the mediation.

D. TAYLOR, PRESIDENT
GENERAL OFFICERS: Sherri Chiesa, Secretary-Treasurer • Peter Ward, Recording Secretary
Tho Thi Do, General Vice President for Immigration, Civil Rights and Diversity

Sincerely,

Jack Gribbon:

Cc: Kristin Martin

Davis, Cowell & Bowe LLP, 595 Market Street, Suite 1400, SF, CA 94105 Tel: (415) 597-7200

**EXHIBIT D**

**Kristin Martin**

| | |
|---|---|
| **From:** | McCandless, Sandra R. <sandra.mccandless@dentons.com> |
| **Sent:** | Thursday, December 17, 2015 9:51 AM |
| **To:** | Kristin Martin |
| **Subject:** | RE: Red Hawk [IWOV-Legal.FID167449] |

Thank you, Kristin.

大成 DENTONS    Sandra R. McCandless

D +1 415 882 2412   |   M +1 415 999 1589   |   US Internal 42412
sandra.mccandless@dentons.com
Bio   |   Website

Dentons US LLP
525 Market Street, 26th Floor, San Francisco, CA 94105-2708

大成 Salans FMC SNR Denton McKenna Long

Dentons is a global legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices.

**From:** Kristin Martin [mailto:klm@dcbsf.com]
**Sent:** Thursday, December 17, 2015 9:34 AM
**To:** McCandless, Sandra R.
**Subject:** Red Hawk [IWOV-Legal.FID167449]

Hi Sandy –

You previously proposed using Arb. John Kagel for the arbitration if we don't get this matter settled in mediation (which of course I am hopeful that we will be able to do).  The Union accepts that proposal.

Kristin Martin
Davis, Cowell & Bowe, LLP
595 Market St. Suite 1400
San Francisco, CA 94105
Tel. 415/597-7200

**EXHIBIT E**

大成 DENTONS

Sandra R. McCandless
Partner

sandra.mccandless@dentons.com
D   +1 415 882 2412

Dentons US LLP
525 Market Street
26th Floor
San Francisco, CA  94105

大成  Salans FMC SNR Denton McKenna Long
dentons.com

December 18, 2015

**VIA EMAIL & U.S. MAIL**

Kristin Martin, Esq.
Davis, Cowell & Bowe LLP
595 Market Street, Suite 1400
San Francisco, CA  94105

      Re:  UNITE HERE/ Shingle Springs Band of Miwok Indians

Dear Kristin:

On behalf of the Shingle Springs Band of Miwok Indians (the "Tribe"), I am writing to inform you, as counsel for UNITE HERE (the "Union"), that the Tribe intends to invoke the dispute resolution process in the Memorandum of Agreement, dated June 26, 2012 ("MOA"). Specifically, the Tribe has learned that the Union has repeatedly violated Paragraph 5(c) of the MOA, which provides that "[t]he Union and its representatives will not directly or indirectly coerce or threaten any employee in an effort to obtain authorization cards."

The Union's violations include (i) persistent harassment of multiple employees at work and at home continuing after the employees have asked that contact cease and (ii) multiple instances of campaigning activities directed toward employees during work time and outside of break rooms.

The Tribe submits this dispute to mediation pursuant to Section 10 of the MOA.  At mediation on January 7, 2016, we intend to mediate whether we can reach a mutually satisfactory resolution. If a resolution cannot be reached in mediation, the Tribe will proceed to arbitration under Section 10 o f the MOA.

I will be available for any dialogue you would like to have at any time prior to the January 7 mediation.

          Sincerely,

          *Sandra R McCandless*

          Sandra R. McCandless

SRM/dps

**EXHIBIT F**

**Kristin Martin**

| | |
|---|---|
| **From:** | Treaver Hodson <THodson@pkwhlaw.com> |
| **Sent:** | Thursday, January 28, 2016 10:44 AM |
| **To:** | Kristin Martin |
| **Cc:** | Sandi Ragusa |
| **Subject:** | Shingle Springs/Unite.  Arbitrator. |

We will go with John Kagel.  Thank you.

---

**Treaver Hodson**
Partner



2277 Fair Oaks Blvd., Suite 455
Sacramento, CA 95825
T  916.442.3552
F  916.640.1521
thodson@pkwhlaw.com



*Confidential Message.  The information in this electronic communication is confidential and may be attorney-client privileged.  It is intended only for the viewing and use of the addressee.  Unauthorized use, disclosure or copying is strictly prohibited.  If you received this electronic communication in error, please immediately notify the sender.*

**EXHIBIT G**



Palmer Kazanjian Wohl Hodson LLP   **Attorneys**

February 4, 2016

Kristin Martin
Davis, Cowell & Bowe, LLP
595 Market Street, Suite 1400
San Francisco, CA 94105

Re:     Memorandum of Agreement; Arbitration of Employment Termination

Dear Ms. Martin:

This correspondence follows our telephone conference on January 27, 2016 regarding various issues between UNITE HERE ("Union") and Shingle Springs Band of Miwok Indians (the "Tribe").  Specifically, we discussed five issues that were left unresolved after the parties' January 7, 2016 mediation.

## Resolution of Certain Issues in the Mediation Process

First, the Union alleged during mediation that the Tribe failed to remain neutral by engaging in certain improper management conduct.  Specifically, the Union alleged that:  (1) managers have told employees not to talk to the Union, not to sign up with the Union, and that the casino does not want the Union and does not need the Union; (2) managers told employees that they cannot wear union buttons; (3) managers have asked employees who attended union meetings and if anyone was being pressured by other employees to join the Union; (4) managers have instructed employees to report who is talking about the Union and threatened that those employees will be fired; and (5) a manager sat across from employees known to be union leaders in the employee dining room, and stared at them as they spoke to another employee about the Union.

Certainly, the Tribe concedes that if any management personnel engaged in the alleged conduct noted above, it would have an obligation under the Memorandum of Agreement between the Union and Tribe ("MOA") to rectify the situation and ensure compliance.  If the Union will provide more detailed information regarding these allegations, the Tribe will appropriately investigate and train its managers regarding these issues.  The Tribe remains committed to taking reasonable steps to ensure compliance with the MOA.

Second, the Union alleged that the Tribe has failed to provide the Union with a complete employee list.  You advised during the telephone conference, however, that the Tribe's Human Resources Manager and Union have established a process for discussing and updating the

February 4, 2016
Page 2

employee list, and that the parties were currently working together to determine relevant information.

Third, the Union alleged that the Tribe has failed to give the Union access to the Casino. As you know, the Tribe does not yet have a solicitation licensing process. I advised you, however, that the Tribe is currently in the process of creating such a process so that the Union may access the Tribe's facilities in a safe and secure manner. You also advised that your office may have access to a licensing process that has previously been acceptable to the Union. I requested that you provide that information for review.

Fourth, the Union alleged that the Tribe has failed to advise employees on neutrality. During the telephone conference, I confirmed that the previous posting, with which the Union took issue, has been removed. I also informed you that the Tribe is concerned with engaging in substantive negotiations over this issue, because the Tribe cannot appear to support the Union by making joint statements or other supportive activity and thereby violate the neutrality provision of the MOA. Still, the Tribe remains fully committed to complying with the terms of the MOA and will, as required by the MOA, properly advise employees of its commitment and determination to remain neutral on union representation issues.

Accordingly, with regard to these particular issues, there does not appear to be any factual dispute between the parties that would justify arbitration at this time. To the extent any remedial measures are appropriate, the Tribe is willing to take reasonable and good faith steps to ensure compliance with the MOA.

## Arbitration of the Garrigues Termination Decision

With regard to the final issue, namely the termination of the employment of Christopher Garrigues, as I mentioned in our telephone call, the Tribe is concerned that by proceeding with a dispute resolution process that is tantamount to a grievance arbitration the Tribe will violate both tribal and federal law.

To be sure, there is no authority under which the parties may arbitrate the matter. The MOA contains no provisions regarding employee discipline and/or termination. The MOA is further silent on any grievance procedure or accompanying remedies for employee disciplinary actions, such as back pay and/or reinstatement. Rather, Section 10 of the MOA provides only for resolution of "disputes over the interpretation or application of [the] Agreement." The termination of Mr. Garrigues does not call for an interpretation or application of the MOA and squarely falls outside the scope of Section 10's reach.

As we discussed, the Tribe has carefully reviewed the termination of Mr. Garrigues anew and remains satisfied that the termination of the employment relationship was conducted consistent with the applicable laws and obligations of the Tribe. These terms and conditions of employment are not, and cannot, be modified by the MOA. All employees, including Mr.

February 4, 2016
Page 3

Garrigues, must be subject to the currently applicable terms and conditions of employment. The Tribe cannot grant him special status or concessions with regard to his employment; otherwise, it will run afoul of both tribal and federal laws. Mr. Garrigues cannot attempt to circumvent the Tribe's due and proper processes and systems by petition to the MOA. Likewise, the Union cannot circumvent those systems on his behalf.

There is no manifestation of any breach of the MOA in the Tribe's exercise of its authority to determine the terms and conditions of employment. The conduct and performance of its employees in the workplace must remain solely in the Tribe. It cannot yield these issues to an outside entity who holds no representation authority. Moreover, there is no provision under the MOA to examine, redress, or otherwise disrupt the termination decision. As such, any challenge to the Tribe's basis for making a termination decision must derive from some source other than the MOA and cannot involve the Union or its processes. To do otherwise thrusts the parties into a grievance arbitration for which there is simply no jurisdiction or authorization in the MOA.

Of course, this is unsurprising as the MOA is not a collective bargaining agreement. As you know, the National Labor Relations Act ("NLRA") proscribes employers from favoring any union that has failed to demonstrate majority status and that does not represent an appropriate bargaining unit of the workforce. 29 U.S.C. § 158(a)(2) (it shall be an unfair labor practice for an employer "to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it"). In language that mirrors the NLRA, the Tribal Labor Relations Ordinance ("TLRO") similarly proscribes the Tribe from dominating or interfering with the formation or administration of any labor organization or contributing other support to it. TLRO, Section 5(2) (it shall be an unfair labor practice for the Tribe and/or employer or their agents "to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it"). Moreover, the MOA itself prohibits the Tribe from granting the Union any support as it pursues majority status and attempts to gain the status of exclusive representative of an appropriate bargaining unit. MOA, Section 5(b) ("for the purposes of this Agreement "Neutrality" means that Manager or management shall not express any opinion for or against Union representation of any existing or proposed bargaining unit composed of Bargaining Unit Employees, or for or against the Union or any officer, member or representative thereof in their capacity as such").

Thus, it follows that neutrality agreements, like the MOA, may not be used to regulate the terms and conditions of employees in the workplace or otherwise run afoul of Section 8(a)(2) and similarly the applicable provisions of the TLRO and the MOA. The Office of General Counsel has stated that "Section 8(a)(2) is grounded in the notion that foisting a union on unconsenting employees and thus impeding employees from pursuing representation by outside unions [is] incompatible with 'genuine collective bargaining.' The totality of the facts in each case is assessed in determining whether an employer has engaged in lawful cooperation with, or has crossed the line and unlawfully supported, an unrecognized union. Thus, an employer violates § 8(a)(2) when it engages in a pattern of conduct that exceeds ministerial cooperation with an

February 4, 2016
Page 4

unrecognized union by explicitly or implicitly conveying a message to its employees that it favors their selection of that union." Advice Letter, Subject: Maryland Live Casino, Case 05-CA-083966, 2013 WL 3865068, at *5 (Jan. 28, 2013) (internal citations omitted).  See *Majestic Weaving Co., Inc. of New York* (1964) 147 NLRB 859, 862 ("there 'could be no clearer abridgment' of the Section 7 rights of employees than impressing upon a nonconsenting majority an agent granted exclusive bargaining status") (internal citations omitted); see also *American Bakeries Co.* (1986) 280 N.L.R.B. 1373, 1377 (any "bargaining prior to achievement of the union's majority status is violative").

*Dana Corp. and International Union* (2010) 189 LLRN (BNA) 1401, 2010 WL 4963202, is particularly instructive here. In it, the Board considered the terms of a neutrality agreement and provided certain factors that, if found, demonstrate violation of Section 8(a)(2). Specifically, the Board opined that if a union purported to speak for the employees or was treated as if it did, Section 8(a)(2) was violated; if the neutrality agreement affected existing terms and conditions of employment or obligated the employer to violate such terms and conditions, it violated Section 8(a)(2); or if the neutrality agreement, its context, or the parties' conduct would reasonably lead employees to believe recognition of the union was a foregone conclusion, Section 8(a)(2) was violated. *Id.*

As such, proceeding with any arbitration of a termination decision would most certainly violate the above factors identified in *Dana Corp.*  Arbitrating the decision indicates to employees that the Union already represents employees and is able to petition on their behalf, without complying with the card check process of the MOA. Arbitrating gives the impression that union representation is either inevitable or already in effect.  Such a grievance arbitration forces the Tribe to treat the Union as if it speaks on behalf of its employees and will undoubtedly affect the existing terms and conditions of the employment relationship.  Also problematic is that the Tribe has already been required to negotiate over its termination decision and such negotiations should only follow actual recognition pursuant to the terms of the MOA. See *Dana Corp.* 2010 WL 4963202 at *9.  Finally, there is little doubt that proceeding with arbitration would "reasonably [lead] employees to believe that recognition of [the Union] is a foregone conclusion." *See id.*

Based on the above, there is no proper jurisdiction and it is unlawful to arbitrate the termination decision under the MOA. As already established, the MOA is not a collective bargaining agreement under which the parties can lawfully arbitrate Mr. Garrigues' termination, nor does the MOA give the Union the right to negotiate over any of the terms and conditions of the employees of the Tribe.  As you also know, the Tribe enjoys "exclusive rights of self-governance in purely intramural matters." *Donovan v. Coeur d'Alene Tribal Farm* (9th Cir. 1985) 751 F.2d 1113, 1116 (citations omitted).  The decision to terminate Mr. Garrigues was purely a private, intramural personnel matter.  Consistent with the principle of the Tribe's recognized right to self-governance, the Union has no right to access employment records and related documentation regarding employees of the Tribe.  Indeed, the Union has not established majority support, and there exist employee privacy interests to which the Tribe must give due concern and deference.

February 4, 2016
Page 5

Further, even if Mr. Garrigues waives his own privacy rights, the Tribe has not waived any applicable rights concerning its internal affairs and related business records and cannot do so, or else face the prospect of supporting the Union unlawfully and treating the Union in a privileged manner as if it had already reached majority status and already represents an appropriate bargaining unit of employees. In addition, proceeding with this particular grievance arbitration will likely invoke the records of other employees who were terminated from employment with the Tribe, generating the same privacy concerns for these former employees as noted above.

Of similar import, Mr. Garrigues is not a party to the MOA. *See* MOA (agreement made and entered by and between the Tribe and the Union). The MOA confirms that the sovereign immunity waiver by the Tribe "shall not be enforced by any other party other than the Parties to the Agreement and shall not give rise to any claim or liability to any other third party other than the Parties hereto." [1] MOA, Section 14(b). Therefore, if Mr. Garrigues so elects to bring a claim against the Tribe, he must first exhaust the Tribe's Tribal Employment Dispute Resolution Process described in the Tribe's Employment Code. *See* Employment Code, Title 6, Article 3, pp. 45-46.

Mr. Garrigues also has no remedy under the TLRO or federal law. The TLRO confines the Tribe's limited waiver of its sovereign immunity for the "sole purpose of compelling arbitration or confirming an arbitration award issued pursuant to the [TLRO] in the appropriate state superior court." TLRO, Section 13(d). Similarly, federal law prohibits suits against Indian Tribes, unless the Tribe (or Congress) has clearly and unequivocally expressed consent to suit (which the Tribe has not done here). See *Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 56, 58-59 (Indian tribes may be sued only where the tribe or Congress unequivocally expresses consent to suit).

For the reasons set forth above, the Tribe has serious concerns that proceeding with a grievance arbitration regarding the decision to terminate an employment relationship will violate tribal and federal law and is inconsistent with the terms of the MOA. Arbitrating the termination decision is tantamount to treating the MOA as a collective bargaining agreement and involves negotiating over the terms and conditions of the employment relationship with a union that has not demonstrated it has majority status among the employees. The Tribe is compelled to conduct itself within the confines of the MOA and applicable law. The NLRA and TLRO are clear that

---

[1] Section 14(b) provides, in relevant part: "**Limited Waiver of Sovereign Immunity.** By this Agreement, the Tribe does not waive, limit, or modify its sovereign immunity from suit except as provided in this Section. The Tribe expressly waives, in a limited matter, its immunity from suit and consents to be sued in any court of competent jurisdiction, including federal and state courts in California, without exhausting tribal remedies, with respect to matters arising out of this Agreement and in the event that the Union is recognized and the Tribe and the Union negotiate a collective bargaining agreement, then this limited waiver will also apply to that agreement, unless the parties mutually agree to a different from of waiver….The sovereign immunity waiver by the Tribe as set forth in this Agreement only extends to claims or proceedings brought by the Union as specified above and shall not be enforced by any other party other than Parties to this Agreement and shall not give rise to any claim or liability to any other third party other than the Parties hereto."

February 4, 2016
Page 6

the treatment of a neutrality agreement as a collective bargaining agreement is unlawful. The MOA further provides no jurisdiction to arbitrate the termination decision. Accordingly, the Tribe is unwilling, at this juncture, to proceed with arbitrating Mr. Garrigues' termination.

However, if the Union intends to proceed with this grievance arbitration, the mechanisms outlined in the TLRO must be followed. Indeed, this matter falls outside the scope of the MOA's dispute resolution processes as it is not a dispute over the interpretation or application of the MOA. The TLRO instructs that pursuant to Section 13, Binding Dispute Resolution Mechanism, the first level of dispute resolution requires an appeal to a designated tribal forum such as a Tribal Council, Business Committee, or Grievance Board. *See* TLRO, Section 13(b). If still unresolved, the parties may proceed to the second level, which requires the involvement of the Tribal Labor Panel. *Id.* at Section 13(c). The third and final level allows a party to seek a motion to compel arbitration in Tribal Court. *Id.* at Section 13(d). In the alternative, even if the Union contends that Section 10 of the MOA applies to this grievance arbitration, the arbitration procedures prescribed in the TLRO are referenced in the MOA and remain in effect. *See* MOA, Section 10. As such, any motion to compel arbitration of this matter must ultimately reside in Tribal Court. *See* TLRO, Section 13(d).

Accordingly, the Tribe rejects the Union's request to arbitrate its decision to terminate the employment relationship of any of its employees during the term of the MOA or until such time as the Union demonstrates that it has majority support as provided in the MOA. As all other matters at issue have been or are in the process of resolution, there are no issues to arbitrate at this time.

Very truly yours,

Treaver K. Hodson

TKH/TT/sr

**EXHIBIT H**

UTI-6100

# DAVIS COWELL & BOWE, LLP
### Counselors and Attorneys at Law

**San Francisco**

595 Market Street, Suite 800
San Francisco, California 94105
415.597.7200
Fax 415.597.7201

Steven L. Stemerman (CA, NV)
Richard G. McCracken (CA, NV)
W. David Holsberry (CA, NV)
Elizabeth Ann Lawrence (CA, NV, AZ)
John J. Davis, Jr. (CA)
Florence E. Culp (CA, NV)
Kristin L. Martin (CA, NV, HI)
Eric B. Myers (CA, NV)
Paul L. More (CA, NV, MA)
Sarah Varela (CA, AZ, NV)
Sarah Grossman-Swenson (CA, NV)
Yuval Miller (CA, NV)
Kyrsten Skogstad (CA, AZ)
David L. Barber (CA)
Kimberley C. Weber (CA)


Robert P. Cowell (1931-1980)


Philip Paul Bowe (CA) (Ret.)
Barry S. Jellison (CA) (Ret.)


**McCracken, Stemerman
& Holsberry**

1630 S. Commerce Street, Suite A-1
Las Vegas, Nevada 89102
702.386.5107
Fax 702.386.9848

February 8, 2016

*Via electronic mail only (thodson@pkwhlaw.com)*

Treavor Hodson
Palmer Kazanjian
2277 Fair Oaks Blvd., Suite 455
Sacramento, CA 95825

   Re: Red Hawk Casino

Dear Mr. Hodson:

   I write in response to your letter dated February 4, 2016. I can respond summarily to much of what you say. UNITE HERE International Union seeks to arbitrate violations of the Memorandum of Agreement between the Shingle Springs Band of Miwok Indians. The Tribe has violated Paragraphs 2(b), 4(a), 5(a) and 5(b) of that MOA, as is explained in more detail in UNITE HERE's nonconfidential pre-mediation brief. All of these provisions are standard in agreements between unions and employers whose employees are not represented by unions, and are enforceable under Section 301 of the LMRA. *See, e.g.*, *SEIU v. St. Vincent Medical Ctr.*, 344 F.3d 977, 984-85 (9th Cir. 2003); *HERE Local 2 v. Marriott Corp.*, 961 F.2d 1464, 1469-70 (9th Cir. 1992). You are incorrect when you hypothesize that UNITE HERE seeks to arbitrate a grievance under a nonexistent collective bargaining agreement. If you believe that any of the conduct described in the pre-mediation brief, including the terminations of Chris Garrigues and Kerry Bond, does not violate the MOA, you may present those arguments to Arbitrator Kagel.

   With respect to the next steps, since you agree that you must arbitrate some of the neutrality violations and the continuing denial of access, we are prepared to present those issues to Arbitrator Kagel now without further delay. Please let me and Arb. Kagel know if you are available on March 10 and/or 11. If you persist in refusing to arbitrate the terminations of Garrigues and Bond, I will

Red Hawk Casino
February 8, 2016
Page 2

sue to compel arbitration. The MOA contains a waiver of sovereign immunity for this purpose, so there is no need to proceed under the TLRO. The MOA also waives the duty to exhaust tribal remedies in tribal court. In accordance with the MOA, we will proceed directly in federal court and, if for some reason the federal court were to decline jurisdiction, we will proceed in state court.

With respect to the access issue, I have inquired about the procedures for access at other Northern California tribal casinos. At Cache Creek Casino and Thunder Valley Casino, union staff present identification when they arrive at the casino and are given visitor badges. UNITE HERE representatives are prepared to do the same at Red Hawk.

Please let me know by close of business February 9, 2016 whether you are available for arbitration on March 10 and/or 11, and whether your client will arbitrate the discharge issues without forcing me to seek a court order compelling your client to do so.

Thank you for your attention.

Sincerely,

Kristin L. Martin

Cc:     Arb. Kagel *(via electronic mail medarb@attglobal.net)*